**DEARDORFF–JACKSON COMPANY,**
Complainant-Appellant Appellee,

v.

**NATIONAL PRODUCE DISTRIBUTORS,**
**INC., Respondent-Appellee Appellant.**

No. 18452.

United States Court of Appeals,
Seventh Circuit.

Aug. 24, 1971

---

------

Harold S. Lansing, Blanksten & Lansing, Chicago, Ill., for Deardorff-Jackson Co., appellee.

Le Roy W. Gudgeon, Chicago, Ill., for National Produce Distributors.

Before SWYGERT, Chief Judge, FAIRCHILD, Circuit Judge, and GORDON, District Judge.[1]

FAIRCHILD, Circuit Judge.

Deardorff-Jackson Company is a wholesale dealer in potatoes and other perishable commodities in interstate commerce, located at Oxnard, California. National Produce Distributors, Inc. is also a wholesale dealer with its main office at times here material at Chicago, Illinois. The two dealers made a contract dated February 26, 1965 for the sale of potatoes by Deardorff to National with delivery during June, 1965. Deardorff shipped a quantity of potatoes which it claims fulfilled the contract. National did not pay in full for those and other shipments, but claims that Deardorff was obligated to deliver more potatoes and that the profit National would have realized on potatoes not delivered more than offset the amount unpaid.

The Perishable Agricultural Commodities Act, 1930 [2] authorizes a proceeding before the Secretary of Agriculture to obtain a reparation order where a dealer in such commodities fails to make payment or fails to deliver in accordance with the terms of a contract. § 499g(c) provides for an appeal to a district court with a trial de novo "except that the findings of fact and order or orders of the Secretary shall be prima-facie evidence of the facts therein stated."

Deardorff sought a reparation order for non-payment and National counterclaimed for failure to deliver. A hearing was held in January, 1967. A representative of the Secretary, after findings and conclusions favorable to National, ordered Deardorff to pay $5,925, with interest from July 1, 1965. Deardorff appealed, and a hearing was held in October, 1969. The district court, reaching a different conclusion, ordered National to pay Deardorff $39,075, with interest. National appealed.

For the greater part, the facts are not in dispute.

Duane Smith, acting for Deardorff, negotiated by telephone in early 1965 with Dan Rietman, president of National. The conversations and an exchange of correspondence February 12 and 17, led to the contract dated February 26, modified, after another telephone conversation, by a further exchange of correspondence March 3 and 10.

The February 26 document, prepared by Smith, read as follows:

"Pursuant to our several conversations via telephone, I will enumerate here below the conditions of the sale of 150 car of potatoes to be shipped during the 1965 Kern County Potato deal from Wasco, Calif.

"National Produce Distributors, Inc., hereafter known as the Buyer and Deardorff-Jackson Co., hereafter known as the Seller do hereby agree as follows:

"That Buyer shall buy and Seller shall sell 100 cars of Longwhite Potatoes containing 450 sacks each and grading US#1 Size "A", 2″ minimum, unstripped and meeting maturity regulations if any exist, otherwise no worse than slightly to moderately skinned, at

------

1. Honorable Myron L. Gordon, District Judge, Eastern District of Wisconsin, is sitting by designation.

2. 7 U.S.C. § 499a to § 499r.

$2.75 F.O.B. shipping point, certificates to read clean.

"That Buyer shall buy and Seller shall sell 50 cars of Red Lasoda Potatoes containing 480 sacks, grading US#1, Size "A", 2″ to 3½″, mostly 2¼″ to 3¼″, at $2.75 F.O.B. shipping point, certificates to read clean.

"That shipment of Longwhite Potatoes to be made from June 1st through June 30th, 1965 but not to exceed five (5) cars on any one day, Monday through Saturday, each week, except that should shipment not start on June 1st, Buyer has the right to make up shipments on the basis of two (2) cars per day.

"That shipment of Red Lasoda Potatoes to be made from June 5th through June 30th, 1965 but not to exceed three (3) cars per day, Monday through Saturday, each week, except that should shipments not start on June 5th, Buyer has the right to make up shipments on the basis of one (1) car per day.

"That Buyer shall pay to the Seller a deposit of $200.00 per car, payment to be made upon the acceptance and signing of this agreement.

"That should the Seller not produce 50 cars of Red Potatoes, the Buyer agrees to substitute one (1) car of White Potatoes for each car of Red Potatoes not produced.

"That the Buyer may refuse to take delivery of all or any portion of the above contract should he wish to forfeit the deposit of $200.00 per car."

On March 3, Rietman signed the February 26 document and returned it to Smith, with a letter reading in part:

"With regard to paragraph 8. It was my impression that if there were not 50 cars of Red Lasodas available from your grower that we could take the amount that was available, as close to the 50 cars as possible; no substitution of White Rose. It was my understanding that you would identify the contract with your grower.

"Another letter from you acknowledging the above will serve as a supplement to the contract without any further changes."

On March 10, Smith replied in part: "Delete paragraph 8 entirely. Substitute in its place the following paragraph:

'That should the Seller not produce 50 cars of Red Potatoes, the Buyer agrees to take the number of cars available, as close to 50 cars as possible.'

"The grower on the above contract will be Barling Bros."

National deposited $30,000, $200 per car for 150 cars. Deardorff shipped 99 cars of white potatoes and there is no present dispute concerning the 100th car. Deardorff, however, shipped only 20 cars of Red Lasodas. On July 2, 1965, in response to a telegram inquiring about the other thirty cars, Deardorff telegraphed National that 20 cars completed the contract as to red potatoes since that "was all the acreage yielded." The market price of Red Lasodas in June was about twice the contract price.

It is Deardorff's position that with respect to Red Lasodas the contract required it to do no more than ship the entire production of Barling Bros., up to fifty cars. This, Deardorff says, it has done.

The evidence is that Barling Bros. is a partnership consisting of Sam and Dan Barling. The partnership grows produce on land it owns and land it leases, and also packs and ships for other growers. On February 16, 1965, Barling Bros. signed an agreement with Deardorff, appointing it exclusive marketing agent for all potatoes produced by Barling Bros. during 1965. The agreement stated that the estimated acreage was 400 acres long white and 50 acres red Lasodas. Barling Bros. had bought Red Lasoda seed potatoes believed to be enough for 50 acres, but some had been frozen and it turned out that only 43 acres could be planted.

Barling Bros. attempted to buy more seed, but could not find any. Planting was finished February 22. The 20 cars of Red Lasodas shipped to National were the total harvest of the 43 acres.

One phase of the case is National's claim that certain additional cars of Red Lasodas shipped by Barling Bros. to other purchasers were grown by Barling Bros., or at least for the purpose of this contract should be treated as if grown by Barling Bros. If so treated, it would follow that Deardorff had failed to fulfill its agreement to ship to National the entire Red Lasoda production of Barling Bros. up to 50 cars.

As already noted, Barling Bros. is a partnership consisting of the brothers Sam and Dan Barling. SNH is another partnership, consisting of the brothers Sam, Dan, and Harley Barling. They grow produce on land owned by their mother, and in 1965 potatoes, including Red Lasodas, grown by SNH, were packed and shipped by Barling Bros. in sacks with various Barling labels.

The testimony of Sam and Dan Barling was all to the effect that the partnership known as Barling Bros. and the partnership known as SNH operated as separate growers. There was no evidence of any arrangement contemplating that potatoes grown by SNH would be available to Deardorff for shipment to National nor of any representation to National that they would be. Neither the officer who acted for the Secretary nor the district court made any finding supporting the claim that the production of Barling Bros. referred to in the contract between Deardorff and National included the production of SNH. Although there is an obvious possibility of confusion between the partnership composed of two Barling brothers and known as Barling Bros. and the partnership composed of three Barling brothers and known as SNH, we think the evidence would not support a finding in favor of National on this branch of the case.

There is, however, another question as to the proper interpretation of the con-tract in the light of the circumstances. The testimony is that production of Red Lasodas per acre varies from 200 to 305 sacks. Even where 305 sacks are produced, they may not all fulfill the specifications for sale. At 480 sacks per car, it is obvious that the 50 acres which Barling Bros. intended to plant could not at best have produced more than 31 full cars. Since 43 acres produced 20 cars, the average number of sacks per acre was 226. At an estimated figure of 270 sacks per acre, 89 acres would have been required to fill 50 cars.

Two perplexing questions are never satisfactorily answered by the record. One is why Smith, knowing he had only 50 acres of Red Lasodas under contract (even if he had not yet learned that the 50 acres had been reduced to 43) would contract to sell "as close to 50 cars as possible." The other is why Rietman, if he had any idea that he might get only 20 cars and in any event no more than 31, would be willing to make a deposit of $200 per car on the 19 to 30 cars he would never receive.

Except for conflicting testimony concerning one telephone conversation, there is no evidence that Rietman was ever informed that Barling Bros.' production of Red Lasodas would be substantially less than 50 cars. In the absence of something putting him on notice of that, it seems to us a reasonable interpretation of the contract that Deardorff bound itself to have made arrangements with Barling Bros. for a planting which could reasonably be expected to yield 50 cars of Red Lasodas, except that it did not bind itself to make good any shortage which might result from weather or other conditions similarly affecting the crop. Given the somewhat ambiguous language, we think it more reasonable to put the burden on Deardorff to have told Rietman it meant substantially less than fifty cars than to put the burden on Rietman to have asked how many were meant.

This seems to be in harmony with the Uniform Commercial Code, in force in both California and Illinois in 1965.

The California Commercial Code, § 2306(1), provides:

"A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." [3]

At the hearing before the district court each party made an offer of proof concerning a telephone conversation between Smith and Rietman in the interval between February 26 and March 3, 1965. Rietman testified that they talked in terms of 50 cars of Red Lasodas, but that Smith told him there might be a shortage of two or three cars. Smith denied that, and testified he told Rietman, "That we would not be able to produce the 50 cars, that there would be 20 or 30, possibly." The district court accepted the testimony only as an offer of proof under Rule 43(c) F.R.Civ.P. and made no finding.

We think the finding would be critical. Unless Rietman was informed of the facts as to the expected production, we think the contract must be construed as a representation and warranty that reasonably adequate arrangements for fifty cars had been made. On the other hand, if he knew the facts, we would think it unreasonable to construe the contract as binding Deardorff to make new arrangements for the production of additional Red Lasodas. The growing period is about 120 days, and there would barely be enough time to produce for June delivery eevn if seed could be obtained and the planting made by March 1.

The district court based its decision on its conclusion that "the reason for failure to produce 50 cars of red potatoes was the inability to obtain certified seed," suggesting that additional acres might well have been leased if seed had been available. The error of this reasoning is that the unavailability of seed had been discovered a week before the original contract date and about three weeks before March 10. It was not a casualty occurring after the promise was made and preventing performance.

Because questions of credibility and weight of evidence are involved, the matter must be remanded to the district court for a finding whether Rietman was informed of the substantial shortage before March 10. If he was, Deardorff is entitled to the order entered by the district court. If not, National is entitled to reparation. The district court is free to take additional testimony if he sees fit.

The order appealed from is vacated and the cause remanded for further proceedings. No costs allowed to either party on appeal.

---

3. The corresponding Illinois provision is found in S.H.A. ch. 26 § 2-306(1).